# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JENNY RUBIN, et al. ) | |
| ) | |
| Plaintiffs–Judgment Creditors, ) | |
| ) | |
| v. ) | |
| ) | **Case No.:** |
| THE ISLAMIC REPUBLIC OF IRAN, et al. ) | **06-11053-GAO** |
| ) | |
| Defendants–Judgment Debtors, ) | **ORAL ARGUMENT** |
| ) | **REQUESTED** |
| v. ) | |
| ) | |
| MUSEUM OF FINE ARTS, HARVARD UNIVERSITY, ) | |
| et al. ) | |
| ) | |
| Trustee Process Respondents. ) | |

## HARVARD PARTIES' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

The "Preliminary Motion to Compel Trustee Respondent Harvard to Comply with Discovery" filed by Plaintiffs-Judgment Creditors ("Pls.' Motion") is both unsound and unnecessary.  It is unsound because Harvard is more than meeting its discovery obligations in this case.  Harvard's personnel have already spent hundreds of hours locating tens of thousands of pages of documents responsive to Plaintiffs' discovery requests and have already produced more than 29,000 pages "as they are kept in the usual course of business," with many more to come.  *See* Fed. R. Civ. P. 34(b)(2)(E)(i).  The Federal Rules do not require Harvard to undertake the unduly burdensome exercise of annotating all of those documents.  To the extent Plaintiffs have questions about the documents, they can notice depositions to have those questions answered, as is customary in any substantial piece of civil litigation.  The motion is also unnecessary.  It raises issues that were never before raised with Harvard's counsel and might have been resolved by discussion between the parties, had Plaintiffs' counsel brought them to Harvard's attention before moving to compel.  In fact, Plaintiffs never identified in writing any specific concerns about Harvard's document production or interrogatory responses before filing the motion.  Plaintiffs filed the motion only 48 hours after Harvard agreed to provide information correlating, as best it could, the documents to the Plaintiffs' requests, and without waiting to determine whether the supplemental information (which was provided on April 10, 2009) might alleviate the need for a motion.

Harvard has produced, and continues to produce, documents in the manner that the Federal Rules of Civil Procedure anticipate and allow.  Because of the broad nature of Plaintiffs' requests and the thousands of objects in Harvard's possession that potentially fall within those requests, Harvard's production is correspondingly extensive: Harvard has produced more than 29,000 pages of documents, with more anticipated in the near future.  Harvard has not

improperly withheld any documents, notwithstanding Plaintiffs' baseless allegation.  On the

contrary, it is Plaintiffs who have refused to produce a single document or to answer a single

interrogatory in this case, being of the view that they are immune from any discovery

obligations.[1]  Plaintiffs' motion should be denied.

## BACKGROUND

### A.    Harvard's Production of Documents

After the status conference held on December 15, 2008, this Court lifted the stay of

discovery in this case, and on January 16, 2009, Plaintiffs served a set of 27 document requests

and two interrogatories on Harvard.[2]  Although Plaintiffs had previously indicated a willingness

to serve narrowly-tailored discovery, the requests are extremely broad, including (for example)

Document Request No. 4, which requests:

> All documents and communications *evidencing or referring to any*
> *antiquities* in the possession and/or control of the Respondent, and
> all documents and communications constituting any inventory of
> *any antiquities* in the possession and/or control of the Respondent,
> including, but not limited to, *all documents and communications*
> with information regarding the description and geographical origin
> of *each such antiquity* and its catalog number (if any); the name of
> the person Respondent alleges to be the current legal owner(s) of
> *each such antiquity*; the date of acquisition by the person
> Respondent alleges to be the owners(s) of *each such antiquity*; the
> exact method of acquisition of *each such antiquity* by the person
> Respondent alleges to be the owner(s) of the antiquity; all
> documents evidencing the acquisitions of each such antiquity by
> the person Respondent alleges to be the owner(s) of the antiquity;
> and the current location of each such antiquity.

---

[1]      *See* Response of Judgment Creditors to Trustee Respondents' Motion to Compel Answers to
Interrogatories and Response to Request for Production of Documents 2 (filed April 8, 2009) (Dkt. 105).

[2]      *See* Plaintiffs-Judgment Creditors' Request for Production of Documents to Harvard University,
President and Fellows of Harvard College, Harvard University Art Museums, Busch-Reisinger Museum,
Fogg Art Museum, Sackler Museum, Semitic Museum, and Peabody Museum of Archeology and
Ethnology ("Pls.' Request for Documents"), Ex. A to Pls.' Motion; Plaintiffs-Judgment Creditors'
Interrogatories to Harvard University, President and Fellows of Harvard College, Harvard University Art
Museums, Busch-Reisinger Museum, Fogg Art Museum, Sackler Museum, Semitic Museum, and
Peabody Museum of Archeology and Ethnology  ("Pls.' Interrogatories"), Ex. B to Pls.' Motion.

Pls.' Request for Documents at 6, Ex. A to Pls.' Motion (emphasis added).  Plaintiffs' requests

defined "antiquity" to mean "any and all objects, artwork, antiques, artifacts, archeological

materials, bronzes, historical instruments, coins, figurines, monuments, textiles, monumental

architectural sculptures, pottery sculptures, relics, ruins, ceramics, seals, shards, statutes, stones,

metalwork, manuscripts, texts, vessels and all other objects originating in Iran."  *Id.* at 2.

Harvard's various departments possess more than 5,000 separately catalogued groups of

objects that may fall within Plaintiffs' definition of "antiquity"; some of those groups in turn

contain dozens—and in one case, hundreds of thousands—of individual artifacts.  *See, e.g.*,

Second Declaration of Genevieve Fisher ("Fisher Decl.") ¶ 3, attached hereto as Ex. 1; Second

Declaration of James Armstrong ("Armstrong Decl.") ¶ 5, attached hereto as Ex. 2.[3]  Harvard's

production so far has focused on objects held by the Peabody Museum of Archaeology and

Ethnology ("Peabody Museum") and the Semitic Museum, although potentially relevant

documents reside within six other different University entities, each of which has its own

recordkeeping practices.  The vast majority of these documents exist only in hard copy and thus

must be photocopied and reviewed without reliance on computer-searching software.  *See, e.g.*,

Fisher Decl. ¶ 3; Armstrong Decl. ¶¶ 4, 6-7, 10, 11.  In addition, some Harvard museums

maintain electronic databases containing information about objects in their collections.  Fisher

Decl. ¶¶ 9, 12; Armstrong Decl. ¶ 9.  Because those databases contain information about

---

[3]      Harvard has objected to Plaintiffs' overbroad definition of "antiquity."  Without waiving that
objection, Harvard undertook to make reasonably diligent efforts to search for documents relating to
objects in its possession, custody, or control that date from before 1794 C.E. and are reasonably believed
to be from within the boundaries of modern-day Iran.  *See* Harvard Parties' Objections and Responses to
Plaintiffs' Request for Production of Documents, Response #4, at 10, Ex. C to Pls.' Motion.  Even that
narrowing has yielded a universe of thousands of catalogue entries relating to hundreds of thousands of
objects.  For example, the Peabody Museum's accessions from excavations at Tepe Yahya in Iran include
approximately 400,000 objects, which consist primarily of pottery fragments.  A separate, un-accessioned
collection includes approximately 200,000 objects, of which tens of thousands may be from Iran.  *See*
Fisher Decl. ¶ 13.

thousands of objects that are not from Iran, it would not be sensible to produce the entirety of the

databases, even if that were technically feasible.  Harvard has therefore undertaken to generate

reports in those databases about objects in the Museums' collections that predate 1794 C.E. and

are reasonably believed to be from within the boundaries of modern-day Iran (*see supra* note 3).

Harvard has already produced those reports for objects in the possession of the Peabody and

Semitic Museums and will produce similar reports for objects in the possession of the Harvard

University Art Museums.  Fisher Decl. ¶¶ 9, 12; Armstrong Decl. ¶ 9.

Harvard museum personnel have spent and continue to spend hundreds of hours

identifying and retrieving documents responsive to Plaintiffs' expansive requests—even though

Harvard has no reason to believe that *any* of its "antiquities" belongs to the Islamic Republic of

Iran, and Plaintiffs have never provided Harvard with any information or documents so

suggesting.  *See* Fisher Decl. ¶ 4; Armstrong Decl. ¶ 3.  To date, Harvard has produced

approximately 29,000 pages of documents, the preponderance of those thus far produced being

from the Peabody and Semitic Museums.

As demonstrated by the accompanying Declarations of Genevieve Fisher and James

Armstrong, who have responsibility for records management at those museums, Harvard has

produced its hard-copy documents "as they are kept in the usual course of business," pursuant to

Fed. R. Civ. P. 34(b)(2)(E)(i), including accompanying labels and file folders, where applicable.

*See generally* Fisher Decl.; Armstrong Decl.  Contrary to Plaintiffs' apparent belief, Harvard's

museums do not have annotated summaries or indices for the documents that Harvard has

produced.  Nor does Harvard have so-called "title reports" summarizing in one place all

provenance information about objects in its collections.  Fisher Decl. ¶ 15; Armstrong Decl. ¶ 12.

Information about the provenance of the thousands of objects in Harvard's collections, to the

extent Harvard possesses such information, can be ascertained only by examining the pertinent

documents, including the reports from Harvard's databases, which are being produced to

Plaintiffs.  Fisher Decl. ¶ 15; Armstrong Decl. ¶ 12.

Some of the documents Harvard produced raise concerns about personal privacy,

potential harassment of third parties, and security.  These concerns were identified in Harvard's

objections to Plaintiffs' document requests.[4]  Notably, Harvard did *not* insist on a protective

order before producing redacted versions of these documents to Plaintiffs, being of the view that

Plaintiffs should receive documents as quickly as possible and that the redacted information is

not relevant to the basic claim at issue in this case, namely whether the items at issue belong to

the Government of Iran.

**B.      Events Preceding The Filing Of Plaintiffs' Motion**

On March 31, 2009, Harvard's counsel received a telephone call from Plaintiffs'

counsel.[5]  Before that call, Plaintiffs had never requested in advance that the parties have a

"discovery conference," as required by Local Rule 37.1, to meet and confer over specific

discovery issues.  In that telephone call, Plaintiffs' counsel asserted that Harvard's document

production was unorganized and that Harvard was required to correlate the documents that it had

produced to Plaintiffs' specific document requests.  Plaintiffs' counsel also asked whether

Harvard had an "index" to the documents that it had produced.  Harvard's counsel explained that

Harvard had produced the documents as they are maintained in the "usual course of business"

under Federal Rule 34(b)(2)(E)(i) and was therefore not required to correlate documents to

---

[4]      *See* The Harvard Parties' Objections and Responses to Plaintiffs' Request for Production of
Document at General Objections #15-17; Specific Responses #4-14, 16-17, 19-21, Ex. C to Pls.' Motion.

[5]      The discussions between counsel are summarized in an April 10 letter from Harvard's counsel,
Paul Wolfson, to Plaintiffs' counsel, David Strachman.  *See generally* Letter from Paul Wolfson to David
Strachman (April 10, 2009) ("Wolfson Letter"), attached hereto as Ex. 3.  Mr. Strachman responded in a
letter dated April 14, 2009.  Letter from David Strachman to Paul Wolfson (April 14, 2009), attached
hereto as Ex. 4.

discovery requests, and that Harvard possessed no "index" of the sort Plaintiffs' counsel appeared to be requesting.

Plaintiffs' counsel raised the issue of redactions, but did not point to any specific redactions in any specific documents that he thought were questionable.  Harvard's counsel explained that the redactions of Harvard documents fell into the following categories: student names, Social Security numbers, confidential donor and lender identities, location and valuation information, and privileged material and work product.  Plaintiffs' counsel further objected to Harvard's responses to Plaintiffs' two interrogatories, which request that Harvard provide extensive information about every single one of the thousands of Iranian artifacts in Harvard's possession.  Pls.' Interrogatories, Ex. B to Pls.' Motion.  Harvard's counsel explained that, to the extent Harvard possessed such information, the information requested in Plaintiffs' Interrogatory No. 1 (which requests a list of all "antiquities" in Harvard's possession or control) and much of the information requested in Plaintiffs' Interrogatory No. 2 (which seeks specific and extensive information regarding each "antiquity" listed in response to Interrogatory No. 1) could be found in documents that had already been produced for the Peabody and Semitic Museums and that would be produced in the future for the Harvard University Art Museums.  *See, e.g.,* SEM 004387, attached hereto as Ex. 5 (representative database report from the Semitic Museum); PMAE 000230, attached hereto as Ex. 6 (representative accession card from the Peabody Museum); PMAE 014604-05, attached hereto as Ex. 9 (representative database report from the Peabody Museum).

Counsel had a further conversation on Monday, April 6.  During that conversation, Harvard's counsel stated that, although Harvard was not required to do so under Rule 34, it would nonetheless agree to correlate, to the best of its ability, the documents produced to

document requests to which they were responsive, and that for the Peabody and Semitic Museums' documents it would provide that correlation to Plaintiffs *later that week*.[6]  Harvard's counsel explained that a set of computer-generated reports about which Plaintiffs' counsel had inquired were, in fact, the reports generated from Harvard's databases described above, and explained that those reports contained the information responsive to Plaintiffs' Interrogatory No. 1 and much of the information responsive to Interrogatory No. 2.  Harvard's counsel agreed to provide the specific Bates ranges for those reports.

At no point in either conversation did Plaintiffs' counsel raise any issue as to whether Harvard had produced its documents as they are kept in the usual course of business.  Nor did Plaintiffs' counsel raise any issue about (a) the document attached as Exhibit E to Plaintiffs' Motion, which Plaintiffs claim not to understand, Pls.' Mem. 5; (b) supposedly blank entries in Exhibit K to the motion, which is one of the reports about objects from Iran that the Peabody Museum generated from its database, *id.* at 8; (c) production of two documents out of sequence, *id.* at 6; or (d) a supposed reference to other documents that have not been produced, *id.* at 8. Plaintiffs' counsel also did not renew the issue of the redactions during the second conversation.

Plaintiffs filed the instant motion on the afternoon of April 8, only 48 hours after counsel's last telephone conversation, and without waiting for either the correlation information that Harvard agreed to provide that week or for a further discussion about interrogatory responses.  Before filing the motion, Plaintiffs had never identified in writing any specific concerns about Harvard's document production or interrogatory responses.

---

[6]     Plaintiffs' assertion that Harvard "refuses to label" its documents according to their document requests, leaving them supposedly "to guess the correlation of the production to the request," is thus simply incorrect.  *See* Judgment-Creditors' Memorandum in Support of Their Preliminary Motion to Compel Trustee Respondent Harvard to Comply with Discovery  ("Pls.' Mem.") 7.  Harvard *agreed* to provide this information to the best of its ability, even though Rule 34 does not require it to do so, and, as reflected in Exhibit 3, provided the information on April 10, 2009.

## ARGUMENT

### I.    Harvard Has Exceeded Its Discovery Obligations Under The Federal Rules Of Civil Procedure

Harvard has produced documents as they are maintained in the "usual course of business" as contemplated by Federal Rule of Civil Procedure 34(b).  Moreover, Harvard has exceeded its document production obligations by additionally correlating—as best it could given the vague, overbroad, and overlapping nature of Plaintiffs' discovery requests—its document production to Plaintiffs' primary document requests.  It would be unnecessary and unduly burdensome to require Harvard to do more than that, and the Rules do not require it.

#### A.    Harvard Complied With Rule 34(b)(2)(E)(i) By Producing Responsive Documents As They Are Kept In The Usual Course Of Business

Rule 34(b) establishes the manner in which a party responding to document requests may produce documents.  It states:

> A party must produce documents as they are kept in the usual course of business **_or_** must organize and label them to correspond to the categories in the request[.]

Fed. R. Civ. P. 34(b)(2)(E)(i) (emphasis added).  "The Rule is phrased in the disjunctive, and the producing party may choose either of the two methods for producing the documents." *MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318-JWL-DJW, 2007 WL 3010343, at *3 (D. Kan. Oct. 15, 2007).  "If the producing party produces documents in the order in which they were kept in the usual course of business, the Rule imposes no duty to organize and label the documents[.]" *In re G-I Holdings, Inc.*,  218 F.R.D. 428, 439 (D.N.J. 2003).

Harvard has satisfied—and is continuing to satisfy—its document production obligations by producing responsive documents as they are kept in the usual course of business.  This is demonstrated by the declarations from Drs. Genevieve Fisher and James Armstrong, who explain

Harvard's filing systems for the Peabody and Semitic Museums, respectively.  Harvard is additionally providing charts identifying, for each Bates-stamped document, the file folder in which the document is maintained, the custodian of each document, and whether the document is maintained in hard copy or electronic form.  *See* Summary of Documents Produced from the Semitic Museum ("Semitic Museum Summary"), attached hereto as Ex. 7; Summary of Documents Produced from the Peabody Museum  ("Peabody Museum Summary"), attached hereto as Ex. 8.

This information more than satisfies the Rule 34(b) standard as applied by courts in similar situations, particularly where—as here—the document requests are "wide-ranging and vague." *Butler v. Portland Gen. Elec. Co.*, No. 88-455-FR, 1990 WL 15680, at *3 (D. Or. Feb. 9, 1990).  Courts have routinely upheld such productions, particularly where the producing party has Bates-numbered the documents and grouped the documents by Bates number in "specific and readily identifiable categories in which they were kept in the usual course of business," as Harvard has done in Exhibits 7 and 8 attached hereto.  *Morgan v. City of New York*, No. 00Civ.9172(LMM)(DFE), 2002 WL 1808233, at *4 (S.D.N.Y. Aug. 6, 2002) (denying plaintiffs' request to correlate all documents with individual discovery requests); *see also Estate of John Townes Van Zandt v. Eggers*, No. 05 Civ. 10661(RJH)(RLE), 2007 WL 3145097, at *2 (S.D.N.Y. Oct. 26, 2007) (denying motion to compel responding party to "specify and organize" approximately 5000 documents because the party had produced documents "as they were kept in the normal course of business").  And Plaintiffs have provided "no indication that [Harvard] has purposefully produced the documents in an inconvenient form." *Butler,* 1990 WL 15680, at *3. The evidence shows exactly the opposite: Harvard has expended considerable effort and resources to comply with Plaintiffs' expansive requests.

Plaintiffs' cases are not to the contrary; they all involve situations in which the producing party provided *no information* about the manner in which the documents were kept.[7]  These cases are manifestly inapplicable here: Harvard has provided ample evidence demonstrating that the documents have been produced as they are kept in the usual course of business.  *See generally* Fisher Decl., attached hereto as Ex. 1; Armstrong Decl., attached hereto as Ex. 2; Semitic Museum Summary, attached hereto as Ex. 7; Peabody Museum Summary, attached hereto as Ex. 8.

If Plaintiffs object to the *volume* of documents produced, they can hardly blame Harvard for that.  Harvard would gladly have responded to a more limited set of discovery requests, tailored to specific artifacts as to which Plaintiffs had some reasonable basis for believing that they could prove Iranian ownership.  Instead, Plaintiffs have cast their net widely, seeking information about *every* "antiquity" of Iranian origin in Harvard's possession, custody, or control.  The approximately 29,000 pages produced thus far is hardly a "document dump" when one considers that they concern thousands of objects held by the Peabody and Semitic Museums.

---

[7]     *See Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 618 (D. Kan. 2005) (producing party failed to "provide the Court with any information, let alone evidentiary proof, to establish that the documents were produced as kept in the ordinary course of business"); *Coopervision, Inc. v. CIBA Vision Corp.*, No. 2:06CV149, 2007 U.S. Dist. LEXIS 57111, at *12-13 (E.D. Tex. Aug. 6, 2007) (producing party's "assertion that it produced documents as kept in the ordinary course of business is unsupported *ipse dixit*" where documents appear to have been simply placed in a box and made available); *Johnson v. Kraft Foods N. Am., Inc.*, 236 F.R.D. 535, 540 (D. Kan. 2006) ("[T]he Court finds no information about the manner in which the referenced document were produced[.]"); *Scripps Clinic & Research Found. v. Baxter Travenol Labs., Inc.*, No. 87-140-CMW, 1988 U.S. Dist. LEXIS, at *10-11 (D. Del. June 21, 1988) (party provided no information about the manner in which it produced the bundles of documents); *T.N. Taube Corp. v. Marine Midland Mortgage Corp.*, 136 F.R.D. 449, 456 (W.D.N.C. 1991) (documents were produced "haphazardly" in a box).  Plaintiffs' two remaining cases are even further afield.  In one, the responding party does not appear to have claimed to have produced documents as kept in the "usual course of business."  *Stiller v. Arnold*, 167 F.R.D. 68, 70-71 (N.D. Ind. 1996).  In the second, the defendant did not search for responsive documents at all, but merely provided the plaintiff access to a document repository in which the defendant stored documents that it had produced in an unrelated lawsuit, "some of [which]. . . *may* be responsive to the general subject matter of [the plaintiff's] request." *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 609 (D. Neb. 2001) (emphasis added).  Neither of these situations is remotely apposite; Harvard has searched for and culled responsive documents from its files and provided them to the Plaintiffs as they are kept in the usual course of business.

*See* Fisher Decl. ¶ 13; Armstrong Decl. ¶ 5.  Courts have recognized that, when a requesting

party submits extensive, wide-ranging document requests, it may bring upon itself the "task of

sorting page by page through a mass of documents[.]"  *3M Co. v. Kanbar*, No. 06-01225 JW

(HRL), 2007 U.S. Dist. LEXIS 45232, at *9 (N.D. Cal. June 14, 2007).  Where, as here, the

document requests are "so wide-ranging and vague," the requesting party is "better situated than

[the producing party] to sort through the documents" to identify the material on which it will

choose to focus its case.  *Butler*, 1990 WL 15680, at *3.

### B.    Harvard Took the Additional Step of Providing Plaintiffs With Its Best Effort To Correlate Each Document To At Least One Document Request

Plaintiffs' motion is doubly flawed because, although not required to do so, Harvard has

complied with *both* disjunctive prongs of Rule 34(b)(2)(E)(i).  As noted above, the Rule is clear

that, "[i]f the producing party produces documents in the order in which they were kept in the

usual course of business, the Rule imposes no duty to organize and label the documents."  *G-I*

*Holdings Inc.*, 218 F.R.D. at 439; *see also MGP Ingredients*, 2007 WL 3010343, at *3.

Nevertheless, in addition to producing responsive documents as they are maintained in the usual

course of business, Harvard *also*—when so requested by Plaintiffs' counsel—correlated each

document to at least one of Plaintiffs' vague and overlapping requests, and provided that

information on April 10, 2009—within *four days* of agreeing to do so.  *See* Schedule B to

Wolfson Letter, attached hereto as Ex. 3.

Accordingly, Harvard has satisfied its obligations twice over.  It has produced responsive

documents as they are maintained in the usual course of business and has correlated every

produced document to a document request in a manner that is amply reasonable given the

overbroad and overlapping nature of the requests.  Plaintiffs' demand that Harvard create

additional work product interpreting or classifying the documents has no support in the Rules.

*See Butler*, 1990 WL 15680, at *2 ("[T]he law does not require a party to prepare or create a document in response to a discovery request[.]").

## II.    Plaintiffs' Individual Complaints Regarding Harvard's Production Are Meritless, Unnecessary, Or Moot

Plaintiffs specify nine alleged deficiencies with Harvard's production, many of which surfaced for the first time in the motion. Pls.' Mem. 5-9. These complaints are meritless because, in many instances, they go far beyond any requirement in the Rules and essentially demand that Harvard create documents or other work product not in existence. Other instances cited by Plaintiffs could have been resolved by discussion between the parties had Plaintiffs raised them, without the need to burden the Court. In addition, despite being under no obligation to do so, Harvard has provided much of the information requested as a courtesy to Plaintiffs, thus rendering many of Plaintiffs' objections moot. Accordingly, Plaintiffs' separate complaints yield no basis for granting their motion to compel.

### A.    Harvard Is Not Obligated To Annotate Its Documents For Plaintiffs

Plaintiffs' principal objection appears to be that Harvard has produced its documents without a "label, catalog, index, description or other organizing tool[.]" Pls.' Mem. 5. As discussed above, Harvard has produced and will produce the documents as they are kept in the usual course of business and *also* has correlated every produced document to at least one of Plaintiffs' document requests to which it is responsive. *See supra* pp. 8-12.[8] Rule 34 does not require Harvard also to create an "index" or other work product in order to explain its documents

---

[8]    Plaintiffs' argument that they were required to "guess" that documents produced with the Bates label prefix "PEA" came from the Peabody Museum is difficult to credit. *See* Pls.' Mem. 5. As this Court is aware, such Bates prefixing is common in litigation, and previous filings in this case have alerted Plaintiffs to the fact (which is public knowledge) that the Peabody Museum possesses objects from Iran— as does the Semitic Museum, documents from which were distinguished with the separate prefix "SEM". In any event, a simple question directed to counsel could have resolved this issue without the need to involve the Court.

to Plaintiffs.  *See MGP Ingredients*, 2007 WL 3010343, at *3 ("If the producing party produces

documents in the order in which they are kept in the usual course of business, the Rule imposes

no duty to organize and label the documents, provide an index of the documents produced, or

correlate the documents to the particular request to which they are responsive."); *Braun v. Agri-*

*Systems*, No. F-02-6482 A WILJO, 2006 WL 278592, at *5 (E.D. Cal. Feb. 2, 2006) ("An index,

whether of documents produced or those in existence . . . , is not required under Rule 34.").

      If Plaintiffs wish to ascertain which of Harvard's documents (if any) supports their

claims, then they are obligated to read the documents and, if they wish, to depose an appropriate

Harvard witness.  Thus, for example, although Plaintiffs claim not to understand the significance

of a particular document from the Semitic Museum, Ex. E to Pls.' Motion, and complain that

Harvard did not provide a label or description of that document, Pls.' Mem. 5-6, Rule 34 does

not obligate Harvard to generate a description if none exists in its files.  *See, e.g.*, *Cardenas*, 230

F.R.D. at 620 ("The Court cannot compel the production of documents that do not exist[.]");

*Butler*, 1990 WL 15680, at *2.  If Plaintiffs wish to explore the significance of that document,

then they are free to raise that issue in a deposition.

      Plaintiffs relatedly complain that Harvard "refuses to even explain what type of

documents they have produced," an argument that appears to be directed to "computer

generated" database reports.  *See* Pls.' Mem 7.  As Harvard's counsel explained to Plaintiffs on

April 6, the "computer-generated" documents are reports of databases maintained by the

Peabody and Semitic Museums that Harvard produced in order to provide Plaintiffs with

information about objects in the possession of those museums.  *See e.g.*, Fisher Decl. ¶¶ 9, 12;

Armstrong Decl. ¶ 9.  Harvard's lawyers are not obligated to walk Plaintiffs' counsel through

entries in the database reports.  If Plaintiffs want more detailed explanations of the reports, they are free under the Rules to take depositions of appropriate Harvard personnel.

There are minor issues raised in Plaintiffs' motion that could have been explained easily had Plaintiff raised those issues with Harvard's counsel.  For example, Plaintiffs point to the fact that some of the fields in a database report from the Peabody Museum are blank.  Pls.' Mem. 8.  The explanation is straightforward: where the reports are blank, that means there is no information in the pertinent field on the database.  Fisher Decl. ¶ 12.  Similarly, Plaintiffs complain that Harvard has not produced other documents that are referred to in the database reports.  As support for this claim, Plaintiffs cite a Peabody Museum database report, Ex. K to Pls.' Motion, which states: "Remarks:  See label with object notes.  See detailed memo in X-File."  This argument reveals that Plaintiffs have not read the documents carefully.  "Label with object notes" refers to information that is on the *very same page of the same document*  – in the "Label With Object" field.  The "X-file" refers to the Peabody Museum accession files that Harvard *has produced*, and which Plaintiffs can find by looking for hard-copy files about objects with the same accession and catalog numbers as those identified on the database reports— exactly as Harvard personnel would find them in their files.  Fisher Decl. ¶ 8.[9]  Harvard is not required to group together each database report with each document to which the report refers; indeed, to do so would be contrary to Harvard's obligation under Rule 34 to produce its hard-copy files as they are maintained in the usual course of business.

---

[9] Plaintiffs' complaint that Harvard's documents use more than one numbering system to refer to Harvard's artifacts lacks merit.  *See* Pls.' Mem. 6.  It is hardly surprising that Harvard might have more than one numbering system at museums that have been collecting artifacts for more than a century—just as libraries sometimes use both the old Dewey Decimal system and more modern systems for cataloguing books.  If Plaintiffs seek more information about those systems, the proper course is to depose the appropriate records custodian.  Moreover, the database reports provide a great deal of information about each artifact beyond the catalog number.

Plaintiffs contend that some of the database reports appear to have been produced out of sequence. Pls.' Mem. 6. In reviewing the Peabody production, Harvard's counsel determined that database reports from the Peabody Museum, of which PEA 0000005 and PEA 0000006 are examples, were printed out of order, and that other documents were photocopied incorrectly. Harvard has taken immediate steps to produce a revised version of the entire Peabody Museum production, which should rectify these problems, and expects to provide the revised production before the status conference on April 27. The chart of the Peabody production (attached hereto as Exhibit 8) reflects the forthcoming revised production. This was an inadvertent production error, which Harvard regrets, but it has no bearing on the manner in which Harvard maintains its records or on Harvard's intent to produce copies of those records as they are maintained. Indeed, Harvard would have corrected this error sooner had Plaintiffs raised it with specificity before filing their motion. At any rate, this objection is moot because Harvard is addressing it.[10]

Finally, Plaintiffs complain that Harvard has not produced a "title report" or "provenance" for objects in its collections. Pls.' Mem. 8-9. Harvard is producing the documents in its possession that are responsive to Plaintiffs' requests. Those documents contain the provenance information that Harvard possesses. Once again, Plaintiffs identify no legal basis for requiring Harvard to generate documents about "provenance" that do not already exist in Harvard's files. *Cf. Cardenas*, 230 F.R.D. at 620 ("The Court cannot compel the production of documents that do not exist[.]"); *Butler*, 1990 WL 15680, at *2 ("[T]he law does not require a party to prepare or create a document in response to a discovery request[.]").

---

[10] Even the corrected production will contain gaps in the catalog numbers of objects referred to because Plaintiffs have asked for, and Harvard has produced, only documents referring to objects from Iran—not all the many other objects in the possession of the Harvard museums.

**B.      Harvard Is Willing To Produce A Redaction Log, But Many Issues About Redactions May Be Resolved By The Parties**

Plaintiffs request that Harvard describe the information redacted on particular documents and identify and describe documents that have been wholly redacted.  Pls.' Mem. 11.  As explained in Harvard's objections to the document requests and repeated in Harvard's April 10 letter to Plaintiffs, the documents include student names and information protected by the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, individuals' Social Security numbers, the identities of donors and lenders that Harvard has agreed to keep anonymous, the identities of certain additional lenders that are particularly sensitive, and precise location and valuation information that could expose objects in Harvard's collections to a heightened danger of theft. The documents also contain information protected by the attorney-client privilege, work product doctrine, and other privileges (including the privilege for unpublished scholarly research). Accordingly, documents containing this information were redacted to protect the information. *See* Wolfson Letter 3, attached hereto as Ex. 3.

Consistent with Rule 26(b)(5), Harvard is willing to produce a redaction log by the close of discovery.  *Rakes v. Life Investors Ins. Co.*, No. C06-0099, 2008 WL 429060, at *4 (N.D. Iowa Feb. 14, 2008) (production of privilege log within discovery deadline was timely).  Thus far, Harvard has given priority to the collection and production of documents to Plaintiffs, so that Plaintiffs can identify the specific artifacts that they believe belong to the Government of Iran— exactly what Plaintiffs have said on many occasions that they intend to do.  Once Plaintiffs narrow their field of inquiry to a smaller set of objects, the parties may agree that Harvard would need to produce a redaction log only for documents referring to those specific objects.  A redaction log for objects in which Plaintiffs have no interest would serve no useful purpose.

Moreover, in such a large document production, creation of a redaction log for the entire production will be an enormous undertaking, and it is Harvard's hope that discussions between the parties can narrow the issues for which such a log would be necessary.  For example, Harvard can think of no reason why Plaintiffs are entitled to or would want individuals' Social Security numbers, student names, or detailed information about the location of particular objects such as the precise shelf and room at a museum or storage facility where an object is located (information that could expose the objects to an increased danger of theft).  It may be that the parties will agree that logging redactions of such information is unnecessary.

**III.     Harvard's Response To Plaintiffs' Interrogatories Satisfies Rule 33(d)**

On January 16, 2009, Plaintiffs served two interrogatories on Harvard.  Interrogatory No. 1 requested an inventory of all "antiquities" in the possession and/or control of Harvard. Interrogatory No. 2 asked for detailed information about each of the objects identified in response to Interrogatory No. 1.  Pls.' Interrogatories, Ex. B to Pls.' Motion.  On February 18, 2009, Harvard responded to these interrogatories by stating that it would "make reasonably diligent efforts to provide reports of objects in Harvard's possession, custody, or control that date from before 1794 C.E. and are reasonably believed to be from within the boundaries of modern-day Iran[.]"  The Harvard Parties' Objections and Responses to Plaintiffs' Interrogatories. Responses # 1 and 2, at 6-8, Ex. D to Pls.' Motion.  Harvard has lived up to this undertaking; it has already provided these reports and other responsive documents from the Semitic and Peabody Museums (a report from the Harvard University Art Museums is forthcoming).  *See* Wolfson Letter 2-3, attached hereto as Ex. 3.  For the Semitic and Peabody Museums, those documents contain all the information requested in Interrogatory No. 1 and most of the

information requested in Interrogatory No. 2, to the extent that Harvard possesses the information.[11]

Harvard has acted in accordance with Rule 33(d), which permits the responding party to answer by specifying the records from which the answer may be obtained when (a) the information is contained in the responding party's business records; (b) the responding party has specified the records from which the information may be obtained; and (c) the burden of deriving or ascertaining the answer to the interrogatory is substantially the same for either party. *See* Fed. R. Civ. P. 33(d).[12] Harvard satisfied the first two prongs of Rule 33(d) by producing business records that contain information responsive to Plaintiffs' two interrogatories, and by providing a chart specifying the records from which Plaintiffs' may obtain the information they seek. *See* Schedule B to Wolfson Letter, attached hereto as Ex. 3. For example, a Semitic Museum database printout contains information that responds to most of the categories of information requested in Plaintiffs' interrogatories. *See e.g.,* SEM 004387, attached hereto as Ex. 5. Specifically, the printout provides, *inter alia*, information regarding the object's catalog number, geographical origin, name of owner, date of acquisition, and exact method of acquisition. The

---

[11]     Harvard has objected to producing some of the information sought by Interrogatory No. 2, including the names of certain persons or entities who have donated or lent artifacts to Harvard. *See* Wolfson Letter 3, attached hereto as Ex. 3. As Harvard explained, Harvard has agreed to maintain the anonymity of certain lenders and donors and cannot, consistent with those obligations, provide that identifying information to Plaintiffs. *Id.* In addition, the identities of some of its lenders are sensitive, and to disclose those identities to Plaintiffs could expose those lenders to the danger of oppression should Plaintiffs attempt to involve them in this litigation. *Id.* The possibility that such third parties might become embroiled in this litigation could also do serious harm to Harvard's scholarly mission because lenders might demand the return of their objects and both lenders and donors might refuse to provide artifacts to Harvard in the future. *Id.*

[12]     Federal Rule of Civil Procedure 33(d) provides: "If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries."

accession cards and database reports produced from the Peabody Museum reveal the same categories of information for each object within the museum's collection. *See, e.g.*, PMAE 000230, attached hereto as Ex. 6 (providing the catalog number of the object as well as information about its geographical origin, whether the object is on loan, the date of the object's acquisition, and the method of acquisition); PMAE 014604-05, attached hereto as Ex. 9 (providing catalog information, geographical origin, and acquisition information). Similar reports from the Harvard University Art Museums will be produced to Plaintiffs, and those will also contain information from which Plaintiffs may glean responses to their interrogatories.

Given that Harvard is producing to Plaintiffs in documentary form the closest thing that it has to an inventory of objects that may be from Iran, the burden of deriving or ascertaining answers to Plaintiffs' interrogatories is substantially the same for Plaintiffs as it is for Harvard. No sensible purpose would be served by requiring Harvard's museum personnel to review database reports, catalog cards, and object files in order to generate written interrogatory answers for more than 5,000 catalogued groups of objects (encompassing more than 400,000 individual objects) when all of that information, to the extent Harvard possesses it, is available to Plaintiffs if they are willing to review the database reports and other documents. Indeed, Plaintiffs are in a *better* position to locate the information they will deem most relevant, since only *they* know which artifacts they believe actually belong to the Government of Iran, having failed to respond to Harvard's narrow requests seeking discovery of Plaintiffs' contentions in this case.

Ultimately, Plaintiffs' Motion is an effort to shift to Harvard their burden to analyze and compile work product to advance Plaintiffs' position. Rule 33(d) does not permit Plaintiffs to require Harvard to help Plaintiffs litigate their case in that manner. Plaintiffs have not shown that the records Harvard has produced, together with the identifying information provided by

counsel, has made it substantially more difficult for Plaintiffs to locate the information they seek

than it would be for Harvard.  Accordingly, there is no basis for compelling any further response

to the interrogatories.  *See Petroleum Ins. Agency v. Hartford Acc. & Indem. Co.*, 111 F.R.D.

318, 320 (D. Mass. 1983) (denying motion to compel responses to interrogatories where the

defendants relied on Rule 33(d): "The bottom line, as I see it, is that the plaintiffs want this

discovery but do not want to expend the effort and expense in procuring it.  But the stated

purpose of [Rule 33(d)] is to require the party seeking the discovery to expend the effort and

expense to procure it.") (emphasis removed).

**CONCLUSION**

For all the foregoing reasons, the Plaintiffs' motion should be denied.

Respectfully submitted,


/s/ Mark C. Fleming_____
Mark C. Fleming (BBO # 639358)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Paul R.Q. Wolfson (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue  N.W.
Washington, DC  20006
(202) 663-6000

*Attorneys for President and Fellows of*
  *Harvard College*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each party by through this Court's ECF electronic filing system.


DATE: April 22, 2009                    /s/ Mark C. Fleming